IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| George F. Morgan,            )<br>               )<br>        Plaintiff,   )<br>               )<br>vs.                )<br>               )<br>Self Regional Healthcare,   )<br>               )<br>        Defendant.   )<br>_____) | Civil Action No. 8:10-382<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendant's motion for summary judgment. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

The only cause of action remaining in this diversity case is for workers' compensation retaliation under South Carolina Code Annotated Section 41-1-80. On February 4, 2011, the defendant filed a motion for summary judgment. The plaintiff filed his response in opposition on February 16, 2011, and the defendant filed a reply on February 24, 2011.

## FACTS PRESENTED

On October 15, 2002, the plaintiff began working at defendant Self Regional Healthcare as a staff nurse in the operating room (pl. dep. 42). During his first five years of employment, the plaintiff's supervisor, Debbie Strickland, who is the Director of the Operating Room at the hospital, documented two specific altercations with co-workers in file memoranda (def. m.s.j., ex. E, F). According to Ms. Strickland, the plaintiff had a tendency to lose his temper and be overly argumentative and unnecessarily confrontational with his co-workers (Strickland dep. 43).

On January 4, 2006, the plaintiff transferred to the position of Clinical Systems Analyst – Operating Room, a Nursing Informatics position that focused on a particular software application utilized in the operating room (pl. dep. 44). In that position, the plaintiff received comments on his 2006, 2007, and 2008 annual evaluations about the need to improve communications with co-workers (*see, e.g.*, def. m.s.j., ex. J, K, L). According to his new supervisor, Melissa Tarleton, who is the Nursing Informatics Manager at the hospital, the plaintiff also behaved aggressively and rudely toward her (Tarleton dep. 268-69). In an email apologizing for his conduct, the plaintiff admitted that he was "rude and indignant and without cause from [Ms. Tarleton]" (def. m.s.j., ex. M).

The plaintiff admits that on January 20, 2007, he threatened to write up Jessie Conner, an operating room nurse, for a perceived performance issue (pl. dep. 87-89). In so doing, he invaded her personal space and spoke rudely to her (def. m.s.j., ex. O; Conner dep. 11-13). Ms. Strickland documented this occurrence in a file memorandum, and she explained to the plaintiff that his conduct was unacceptable (pl. dep. 87-89; def. m.s.j., ex. O). The defendant contends that under the Standards of Conduct the plaintiff's behavior was a Group I violation subject to immediate discharge (Mike Dixon aff. ¶ 3; def. m.s.j., ex. R). Ms. Strickland reported the incident to Ms. Tarleton, and Ms. Tarleton exercised her discretion to afford the plaintiff an opportunity to correct his behavior without formally writing him up (Tarleton aff. ¶ 4). Ms. Strickland explained to the plaintiff that he had no authority over operating room staff nurses and should bring any concerns about their performance to her attention or to the attention of another supervisor. The plaintiff acknowledges that Ms. Strickland further explained that it was inappropriate for him to threaten disciplinary action against an operating room employee and that he must not take it upon himself to confront operating room staff about their perceived performance (pl. dep. 88-89; def. m.s.j., ex. O).

2

On August 21, 2007, the plaintiff confronted Kelly Davis, another operating room employee, about an alleged performance issue. The plaintiff admits that he raised his voice at Ms. Davis, and he admits that his behavior was inappropriate (pl. dep. 92-93; def. m.s.j., ex. S, T). Mary Goldman, another operating room employee, heard him through a metal screen and double doors (Mary Goldman aff. ¶3; def. m.s.j., ex. V). According to Ms. Strickland, this behavior was unacceptable both because the plaintiff mistreated a co-worker and because he had no authority over operating room staff and had been expressly directed not to confront them about perceived performance issues (def. m.s.j., ex. W). The defendant issued a formal counseling memorandum and put the plaintiff on a formal performance improvement plan (the "First PIP"), which the plaintiff signed (pl. dep. 100-101; def. m.s.j., ex. X). Under the First PIP, the plaintiff agreed to:

- Refrain from acting aggressively toward OR [Operating Room] staff;

- Recognize that he had no authority to discipline OR staff by refraining from threatening to report them;

- Recognize that OR staff frequently write e-mails in all caps and that such is not an indication of anger or hostility;

- Write a letter of apology to Kelly Davis;

- Communicate with the OR staff through Debbie Strickland, rather than directly;

- Discuss recurring practice issues with his immediate supervisor and leave to her the task of bringing such issues to the attention of Ms. Strickland or other interested parties; and

- Consider using the Employee Assistance Program to seek counseling for anger management issues.

(Def. m.s.j., ex. X). The plaintiff admits that he agreed to all of the terms of the First PIP, and he admits that he was specifically told that he was to address concerns about operating

3

room staff with Ms. Strickland and not with the staff directly (pl. dep. 97, 200-201; def. m.s.j., ex. Y).

On February 26, 2008, the plaintiff confronted Donna Soboslai, an information technology employee, about a perceived flaw in the assistance she provided him (pl. dep. 105; Donna Soboslai aff. ¶ 3; def. m.s.j., ex. AA). Ms. Soboslai testified in her affidavit that the plaintiff invaded her personal space, raised his voice, treated her in a demeaning fashion, and was unnecessarily confrontational (Soboslai aff. ¶ 3; def. m.s.j., ex. AA). Ms. Soboslai thought he was going to strike her (Soboslai aff. ¶ 3). The plaintiff does not dispute any aspect of the write-up of the incident by Administrative Director of Clinical Services Carole Burgard (pl. dep. 105; def. m.s.j., ex. AA). Again, the defendant contends that this was another Group I violation for which the plaintiff could have been terminated immediately. However, Ms. Burgard placed the plaintiff on a Second PIP that incorporated the terms of the First PIP and stated explicitly that the plaintiff would refrain from behaving improperly toward any of the defendant's employees (Dixon aff. ¶ 5; def. m.s.j., ex. BB). The plaintiff was expressly advised that this was his final opportunity to correct his inappropriate behavior and that any further misconduct would lead to his immediate termination (def. m.s.j., ex. AA, BB). Ms. Burgard expressly warned the plaintiff that "he was going to get himself fired" if he continued to misbehave (def. m.s.j., ex. AA).

On October 9, 2008, the plaintiff reported that he sensed an acrid smell and experienced a tingling sensation while working in his shared office in Nursing Informatics (pl. dep. 46-48). He was immediately sent to employee health, where he was admitted to the hospital overnight for observation (*id.*; Tarleton dep. 169-69; pl. workers' comp. dep. 69-70). The defendant confirmed that no one else in Nursing Informatics, including the plaintiff's officemate, sensed this smell or experienced these symptoms (Tarleton aff. ¶ 4). The plaintiff was cleared to return to work the following Monday, but he claimed to

4

experience the same symptoms (pl. dep. 46-48).  Accordingly, he was moved to another office pending further study (*id.*).

In an email dated October 16, 2008, Mike Dixon, the Director of Human Resources, sent an email to Connie Conner, the Chief Nursing Officer, stating the following:

> I'm disappointed that Mr. Morgan is threatening to call a lawyer if we do not put an air monitor in his office.  My initial impulse is to find the smallest, cracker box size, noisiest, office in the hospital and put him in there.

> From what I understand - we took prompt action and have placed him in another office until the issue is resolved.  I would like to meet with him and Melissa.  I do not take it lightly when an employee threatens legal action at the drop of a hat.

(Pl. resp. m.s.j., ex. A).  Ms. Conner replied: "You crack me up.  I agree - find one for him and stuff him in there.  Yes, meet with her and him.  He is a piece of work" (*id.*).

Mr. Dixon documented the October 20th meeting with the plaintiff and the plaintiff's supervisor, Ms. Tarleton, in a memorandum.  He stated that he felt the plaintiff was trying to provoke him into a confrontation during the meeting, and he told the plaintiff he was being disrespectful.  Mr. Dixon ended the meeting by telling the plaintiff that an air quality test would be performed.  He stated that he felt the plaintiff was "trying to bully the hospital and build a case against us" (*id.*).  In his deposition, the plaintiff testified that he told Mr. Dixon during the meeting that he felt people did not believe him when he described his symptoms.  He stated that he had seen people roll their eyes at him.  He felt like Mr. Dixon did this during the meeting with him, and he told Mr. Dixon, "You know, what you just did is exactly what I was explaining to you earlier."  He testified that Mr. Dixon "leapt to his feet, leaning over his desk, saying to me, 'Just what did you mean by that?'" (pl. dep. 151).  He

testified that Mr. Dixon terminated the meeting, opened the door for him and said "Allow me," and then slammed the door when he walked through (pl. dep. 151-52).

The defendant hired Risk Tech, LLC, an environmental health firm, to conduct a professional air quality study in the relevant office (Dixon aff. ¶6; pl. dep. 50; def. m.s.j., ex. DD). That study found that the air quality was within normal and acceptable limits (def. m.s.j., ex. DD; pl. dep. 50). The defendant then permitted the plaintiff at his request to move back to his old office, but, shortly thereafter, on November 17, 2008, the plaintiff reported experiencing the same symptoms (pl. dep. 52; Tarleton aff. ¶ 5). Accordingly, the defendant sent the plaintiff back to employee health, moved the plaintiff to an office in the operating room, and never again asked him to work in the office that allegedly gave him trouble (pl. dep. 52; Tarleton aff. ¶ 5; pl. workers' comp. dep. 82). The plaintiff does not claim that he made any requests of the defendant related to this issue that were denied (pl. dep. 49-50, 54-55).

The plaintiff sought to have the defendant pay his medical expenses associated with his "allergic responses" in October and November. The defendant's carrier denied that either episode was work-related. On November 24, 2008, Mr. Dixon emailed Ms. Conner stating that the plaintiff had received notification that his claims were denied. Janet Smith, Carole Burgard, Melissa Tarleton, and Maria Shealy were copied with the email. Mr. Dixon stated that Maria Shealy would direct the plaintiff to the appeal process. He further stated that he was going to set up a meeting with the hospital's attorney and that Ms. Smith and Ms. Tarleton would take part in that call. He ended the email by stating, "Any others that would like to join the party - just let me know" (pl. resp. m.s.j., ex. A).

On December 2, 2008, the plaintiff filed a workers' compensation claim in connection with the injuries purportedly sustained because of the acrid odor in his office. That claim was ultimately denied by the Workers' Compensation Commission for lack of medical evidence supporting the plaintiff's claim (def. m.s.j., ex. EE).

6

On December 17, 2008, the plaintiff received his 2008 Performance Evaluation (def. m.s.j., ex. L).  He admits that he did not dispute any portion of this evaluation (pl. dep. 107).  The evaluation noted that the plaintiff was under a Second PIP and that he was expected to comply with the terms of that PIP.  The evaluation found that the plaintiff "meets job standards," and it qualified the plaintiff for a 3% wage increase (def. m.s.j., ex. L; Tarleton dep. 176).

On January 15, 2009, the plaintiff confronted operating room nurses Elizabeth Still and Keyna Baker about a presentation they gave on the proper use of a piece of operating room equipment known as a "slush machine" (pl. dep. 109; Elizabeth Still dep. 31; def. m.s.j., ex. FF; Kenya Baker dep. 37; def. m.s.j., ex. GG).  The plaintiff admits that he confronted Ms. Still and Ms. Baker directly, instead of going through Ms. Strickland as his PIP required (pl. dep. 109, 112).  He further admits that he "allowed [his] personal sentiments to override common decency" when he approached the two nurses (*id.* at 148). According to Ms. Still and Ms. Baker, the plaintiff got in their "personal space," grabbed their shoulders, and yelled at them that they did not know what they were doing (Baker dep. 10-12; Still dep. 9-10; def. m.s.j., ex. FF, GG).  Ms. Still and Ms. Baker reported the incident to Janice Arnett, a nurse manager, who referred them to Debbie Strickland (Arnett dep. 13-15).  Ms. Strickland then spoke to Ms. Still, Ms. Baker, and the plaintiff, and she memorialized the results of these discussions in a file memorandum (Strickland dep. 97-100; def. m.s.j., ex. KK).

Ms. Strickland claims that when she tried to talk to the plaintiff about the incident, he behaved aggressively toward her as well (Strickland dep. 118; def. m.s.j., ex. KK). Ms. Strickland reported the incident to Ms. Burgard, her supervisor, who met with Ms. Still and Ms. Baker separately to discuss the incident (Strickland dep. 118; Burgard dep. 78-79).  After discussing the situation with Ms. Conner, Ms. Burgard met with the plaintiff on January 28, 2009, discussed the incident with him, and placed the plaintiff on paid

7

administrative leave (Burgard dep. 36; def. m.s.j., ex. MM).  The defendant terminated the plaintiff's employment on January 30, 2009 (def. m.s.j., ex. NN; Conner aff. ¶ 3; Burgard aff. ¶ 5; Dixon aff. ¶ 6).

Following his termination from employment, the plaintiff filed an internal grievance claiming that he was improperly terminated because of his national origin: British (def. m.s.j., ex. QQ).  That grievance was denied (*id.*, ex. RR).  On August 26, 2009, the plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in which he alleged discrimination based upon his gender and age and retaliation for complaining of gender and age discrimination.  The EEOC dismissed the charge with a "no cause" finding (*id.*, ex. SS, TT).  The instant lawsuit followed.  The Honorable J. Michelle Childs, United States District Judge, dismissed the plaintiff's three contract causes of action on December 3, 2010.  Only the plaintiff's workers' compensation retaliation claim remains.

### APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1)  there is no genuine issue as to any material fact; and (2)  that he is entitled to summary judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.  Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

The plaintiff alleges that he was terminated from employment in retaliation for filing a workers' compensation claim under South Carolina Code Annotated Section 41-1-80, which provides in relevant part that "[n]o employer may discharge or demote any employee because the employee has instituted or caused to be instituted, in good faith, any proceeding under the South Carolina Workers' Compensation Law [the "Act"] . . . ." S.C.

Code Ann. § 41-1-80.  The plaintiff bears the burden of proving: "(1)  institution of workers' compensation proceedings; (2)  discharge or demotion; [and] (3)  a causal connection between the first two elements." *Hinton v. Designer Ensembles, Inc.*, 540 S.E.2d 94, 97 (S.C. 2000).  To satisfy the causation element, the plaintiff must prove that the filing of a workers' compensation claim was the "determinative factor" in his termination. *Id.*  In other words, the plaintiff must show that "he would not have been discharged 'but for' the filing of the claim." *Wallace v. Milliken & Co.*, 406 S.E.2d 358, 360 (S.C. 1991).

The statute gives employers several affirmative defenses, including the employee's "failure to meet established employer work standards" and "violating specific written company policy for which [termination] is a stated remedy of the violation." S.C. Code Ann. § 41-1-80.  "While the employer has the burden of proving its affirmative defenses, the employer does not have the burden of establishing the affirmative defenses are causally related to the discharge." *Hinton*,  540 S.E.2d at 97.

Here, the plaintiff admits that, on January 15, 2009, he confronted Ms. Still and Ms. Baker directly about a perceived performance issue rather than going through Ms. Strickland as he was directed to do in his Second PIP.  He further admits that he allowed his "personal sentiments to override common decency" during his discussion with them (pl. dep. 109, 112, 148).  It is also undisputed that the plaintiff was warned that violating the Second PIP would lead to his immediate termination (def. m.s.j., ex. AA, BB).  Thus, the plaintiff "fail[ed] to meet established work standards" and "violat[ed] a specific written company policy for which [termination was] a stated remedy of the violation."  Both of these situations constitute affirmative defenses under Section 41-1-80.

When, as here, the employer proffers a "legitimate, non-retaliatory reason" for the termination, any temporal proximity between the filing of the workers's compensation claim and the termination is insufficient as a matter of law to defeat summary judgment. *Hinton*,  540 S.E.2d at 97.  Furthermore, to survive summary judgment, the employee must

10

come forward with evidence sufficient to raise an inference that the employer's stated reasons were a mere pretext for illegitimate retaliation:

> The South Carolina Supreme Court, in addition to establishing a but-for causation test to govern these cases, has determined that the plaintiff must provide evidence sufficient to support the conclusion that the employer's proffered reason for discharging the employee was pretext for retaliation.

*Porter v. U.S. Alumoweld Co., Inc.*, 125 F.3d 243, 248 (4th Cir. 1997) (*citing Wallace*, 406 S.E.2d at 360).

In his response in opposition to the motion for summary judgment, the plaintiff complains that the defendant relies on

> several Federal citations to support its arguments that (1) a retaliation claim fails as a matter of law when the employee is treated favorably after he engages in protected activity; (2) a typical component of any retaliation claim is proof that similarly situated employees who did not engage in protected activity were treated more favorably than plaintiff; and (3) to determine the plausibility of a retaliation claim, courts often consider the treatment of other employees who engaged in similar protected activity.

(Pl. resp. m.s.j. 6-7). However, as argued by the defendant, the South Carolina Supreme court has adopted the *McDonnell Douglas* framework, which is used in deciding Title VII claims, for analyzing Section 41-1-80 claims. *See Wallace*, 406 S.E.2d at 360 (*quoting Buckner v. General Motors Corp.*, 760 P.2d 803 (Okla. 1988)). Furthermore, South Carolina appellate courts and federal courts in this District have cited federal retaliation cases as persuasive authority in analyzing Section 41-1-80 claims. *See, e.g. Hines v. United Parcel Serv.*, 736 F. Supp. 675, 678 (D.S.C. 1990) (Perry, J.) (*citing* Title VII cases in analysis of § 41-1-80 claim)*; Horn v. Davis Elec. Constructors, Inc.,* 440 S.E.2d 398, 410 (S.C. Ct. App. 1994) (same)*.

The plaintiff sets forth four circumstances that, in his view, create genuine issues of material fact: (1)  the six-week gap between his workers' compensation claim and his termination; (2)  his receipt of favorable performance reviews during his employment; (3)  his placement on the Second PIP based on an undisputed oral report of misconduct; and (4)  the lack of any further investigation of his misconduct between January 28 and January 30.

The plaintiff has failed to show that issues of material fact remain.  As noted above, when, as here, "the employer articulates a legitimate, nonretaliatory reason for the termination, the proximity in time between the work-related injury and the termination is not sufficient evidence to carry the employee's burden of proving a causal connection." *Hinton*, 540 S.E.2d at 97.  Furthermore, with regard to the plaintiff's point about his favorable performance reviews, the defendant has never claimed that the plaintiff was an incompetent nurse. His annual performance reviews reflect both his competence in many areas *and* his behavior issues (*see* def. m.s.j., ex. K, L).  Importantly, the plaintiff received a favorable performance review qualifying him for a three percent raise *after* he engaged in protected activity, which is inconsistent with any inference of retaliation. *See EEOC v. TJX Companies, Inc.*, No. 7:07-cv-66-F, 2009 WL 159741, at *8 (E.D.N.C. Jan. 22, 2009) (slip copy) (Title VII case noting that favorable treatment following protected activity negates inference of discrimination).  The plaintiff also argues that the Second PIP was issued "contrary to [Ms. Tarleton's] representations to [Ms.] Soboslai and Self's policies and procedures," arguing this is evidence of pretext (pl. resp. m.s.j. 9).  However, as pointed out by the defendant, the Second PIP was issued seven months prior to the plaintiff's workers' compensation injury, and thus it could not be evidence of retaliatory intent.

The plaintiff's argument that the defendant did little investigation between the afternoon of January 28, when the plaintiff was suspended, until his termination at 9:00 a.m. on January 30th also fails to raise an issue of material fact (pl. resp. m.s.j. 10).  The evidence

shows that the investigation was completed before January 28th.  On January 15th, Ms. Still and Ms. Baker reported the incident to Janice Arnett, a nursing supervisor, who reported it to Ms. Strickland (Arnett dep. 13-15).  Ms. Strickland then met with Ms. Still and Ms. Baker separately and documented the substance of those conversations in a file memorandum (Strickland dep. 97-100; def. m.s.j., ex. KK).  She next met with the plaintiff and documented his side of the story in that same memorandum (Strickland dep. 118; def. m.s.j., ex. KK).  Ms. Strickland reported her findings to Ms. Burgard (Strickland dep. 118; Burgard dep. 78-79).  Ms. Burgard then met with the two nurses separately as well to ensure that their statements were the same (Burgard dep. 78-79).  Their statements were memorialized in writings, which they each signed (def. m.s.j., ex. FF, GG).  Ms. Burgard also met with the plaintiff and heard his side of the story (*id.*, ex. MM).  Ms. Burgard then recommended that plaintiff's employment be terminated, and she placed the plaintiff on paid administrative leave pending a final decision on January 28th (*id.*).  Ms. Conner and Mr. Dixon then met with Ms. Burgard and reviewed the information available, and based on this review, they accepted Ms. Burgard's recommendation that plaintiff's employment be terminated (Dixon aff. ¶ 6; Conner aff. ¶ 3).  While the plaintiff complains that Ms. Burgard did not adequately investigate the incident between January 28th and the 30th, it is clear that Ms. Burgard had already completed her investigation by the 28th when he was suspended.

The plaintiff further argues that his termination was a "foregone conclusion" based on the e-mail between Mr. Dixon and Ms. Conner in which Mr. Dixon stated in pertinent part:  "I'm disappointed that Mr. Morgan is threatening to call a lawyer if we do not put an air monitor in his office.  My initial impulse is to find the smallest, cracker box size, noisiest, office in the hospital and put him in there" (pl. resp. m.s.j., ex. A).  According to the plaintiff, this e-mail demonstrates "retributive response and palpable angst occasioned by [the plaintiff]'s requests related to his work injury" (*id.* 2).  However, as argued by the defendant, the plaintiff's reading is contrary to the plain text of the e-mail in which Mr. Dixon

13

further stated that he was "disappointed" that plaintiff was threatening legal action, given that the defendant "took prompt action" in response to the plaintiff's concerns and "placed him in another office" (*id*., ex. A).  Indeed, as Mr. Dixon explained to the plaintiff a few days later, the defendant: (a)  moved the plaintiff to an office where he was asymptomatic, (b) ensured that he received appropriate medical care, and (c)  scheduled a professional air quality test to ensure the safety of his old office (*id*.).  Clearly, Mr. Dixon was frustrated with the plaintiff's threat to call a lawyer if he was not given an air monitor.  This court finds that such is not evidence of pretext with regard to the plaintiff's termination from employment some three months later.

The defendant further argues that even if the email is read as expressing displeasure with the plaintiff's workers' compensation claim itself, it still would not raise a genuine issue of material fact because it was a stray, isolated remark that was unrelated to the employment decision in question:  the plaintiff's termination. *See, e.g., Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1999) (ADEA case noting that stray remarks unconnected to employment decision at issue are not enough to survive summary judgment); *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 548-50 (4th Cir. 1995), *rev'd on other grounds by*, 517 U.S. 308 (1996) (ADEA case finding that supervisor's remarks were insufficient evidence of discriminatory intent because the remarks were not made in the context of replacing the plaintiff).  This court agrees.

Here, no reasonable factfinder could find that the filing of the plaintiff's workers' compensation claim was the determinative factor in his dismissal; nor could such a factfinder find that the defendant's reason for terminating the plaintiff's employment was pretextual.  *See Porter*, 125 F.3d at 248-49.

14

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment (doc. 59) be granted.


June 9 , 2011                                          s/ Kevin F. McDonald
Greenville, South Carolina                    United States Magistrate Judge

15